[Decided January 12, 1888.]

## BRITISH BARK LATONA, F. F. PERCIVAL, CLAIMANT, *v.* JOHN W. McALLEP.

1. COLLISION—BETWEEN STEAM AND SAIL—ABANDONMENT OF THE INJURED VESSEL—DAMAGES.—A sailing vessel of 800 tons burden was overtaking a steamer of six tons burden, which blew its whistle and awaited the vessel's approach at a sufficient distance from its course to avoid a collision. The vessel had no lookout, and, when nearly opposite the steamer, suddenly changed her course, collided with the steamer, and then resumed her course, making no effort to save the sinking steamer's crew: *Held,* that the vessel was liable for damages to the steamer, for the expenses of endeavoring to raise it, and for personal injuries to the crew.

2. APPEAL—REQUISITES—NOTICE.—Under the appeal act of 1883, providing that the Supreme Court shall hear all causes removed to it on the merits, disregarding technicalities, where a notice of appeal describes the decree appealed from, which was rendered October 7th, as of date October 1st, the error will be disregarded, it not appearing that there was any other decree in the cause.

3. SAME—REQUISITES—STATEMENT OF FACTS.—Section 3 of such act, relating to the manner of settling and certifying a statement of facts on appeal, is permissive, and does not affect the jurisdiction of the Supreme Court; and such statement may be certified by the lower court after appeal is perfected.

APPEAL in Admiralty from the District Court holding terms at Seattle. Third District.

John W. McAllep, owner of the steamer Underwriter, libelled the British bark Latona, for damages arising out of a collision between the bark and steamer, which occurred in the bay at Port Townsend, on January 21, 1885, and which resulted in the total loss of the steamer. There was a decree for the libellant, from which the claimant appealed. All the material facts appear in the opinion of the court.

*Messrs. McNaught, Hanford & McGraw*, for the Appellant.

The rule that steam vessels must keep out of the way of sailing vessels, under all circumstances when it is possible to do so, is imperative, and there are few, if any, cases in which it is not possible when the steamer is under command. (*The Lucille*, 15 Wall. 676; *The Carroll*, 8 Wall. 302; *The Fannie*, 11 Wall. 238; *The Johnson*, 9 Wall. 146; *The City of Paris*, 9 Wall. 634; *The Wenona*, 19 Wall. 41; *The Falcon*, 19 Wall. 75; *The Norwich Co.* v. *Wright*, 13 Wall. 104; *Crockett* v. *Newton*, 18 How. 581; *The Oregon* v. *Rocca*, 18 How. 570; *Fretz* v. *Bull*, 12 How. 466; *The Louisiana* v. *Fischer*, 21 How. 1; *The Benefactor*, 102 U. S. 214; *The Civilta and the Restless*, 103 U. S. 699; *The George Murray*, 22 Fed. Rep. 117; *The Thomas P. Way*, 22 Fed. Rep. 729; *The Laura V. Rose*, 28 Fed. Rep. 104; *Steamboat Narragansett*, Olcott's Rep. 249.) It is the duty of a steamer to give a sailing vessel ample margin to pass unobstructed, and to seasonably adopt a proper course to necessarily avoid a collision, and, although she could not at the moment prevent it, this will not excuse her if, by timely prudence on her part, she could have avoided the danger. (*The Steamboat Syracuse*, 12 Wall. 167; *The Teutonia*, 23 Wall. 77; *Haney* v. *Baltimore Steam Packet Co.*, 23 How. 287.) If from the evidence the court should find that the bark unnecessarily changed her course, and thereby caused the collision, still she will not be considered as having committed a *fault*, but an *error* merely, because of the greater fault of the steamer

in placing her in peril. (*New York & Liverpool and U. S. Mail S. S. Co.* v. *Rumball*, 21 How. 372; *Bentley* v. *Coyne*, 4 Wall. 509; *The Sea Gull*, 23 Wall. 165; *The Nichols*, 7 Wall. 656; *The Fairbanks*, 9 Wall. 420; *The Favorita*, 18 Wall. 598; *The Renovator*, 30 Fed. Rep. 194; *The Santiago de Cuba*, 10 Blatchford, 444; Cohen's Admiralty, 221; Henry's Admiralty, sec. 84.) The rule that a following and overtaking vessel must adopt measures to avoid a collision, and will be held in fault for failure to do so, is not applicable to cases of vessels approaching each other on intersecting lines. (*The Cayuga*, 14 Wall. 270.)

*Messrs. Struve, Haines & McMicken*, for the Appellee.

If two vessels, one of which is a steamer, and the other a sailing vessel, are proceeding in such a direction as to involve risk of collision, the sailing vessel must keep her course. This duty is imperative. (Rules for preventing collisions, Nos. 20, 23, sec. 4234, Rev. Stats. U. S.; Desty's Commerce and Navigation, 44; *The John L. Hasbrouck*, 93 U. S. 405; Desty's Shipping and Admiralty, sec. 376, and cases cited; Cohen's Admiralty Law, 219; *The Adriatic*, 107 U. S. 517.) The steamer may be managed upon the supposition that the sailing vessel will keep her course, and if she does this, and a collision results from the sailing vessel's not doing so, the sailing vessel alone is at fault. (*The Free State*, 91 U. S. 200; *St. John* v. *Paine*, 10 How. 583, 584; *The Scotia*, 14 Wall. 170.) The sailing vessel is as much bound to keep her course as a steamer is to keep out of her way. The obligations are correlative, and the sailing vessel is bound to keep her course and to refrain from embarrassing the steamer by any new movement. The steamer has a right to rely on this, and if a collision occurs by reason of any unexpected change of course on the part of the sailing vessel, the sailing vessel alone is liable. (*The Illinois*, 103 U. S. 298; *The Ellen Holgate* v. *The Illinois*, The Reporter, vol. 6, p. 40; *The Virginia*, 24 Fed. Rep. 763.) If it appear that the steamer took the precautions which would have been proper

if the sailing vessel had kept her course, and that the collision was caused by an unexpected change of course on the sailing vessel's part, the sailing vessel is liable for all damages occasioned thereby. (*The Potomac*, 8 Wall. 590; *The Jay Gould*, 7 Ben. 566; *The Virgo*, 7 Ben. 495; *The Ferryboat Gerard Stuyvesant*, 8 Ben. 183.) The sailing vessel is bound to exercise equal skill and prudence in passing a steamer as another sailing vessel. The only distinction being, that in respect to the steamer, the vessel under sail is to adhere to her own course so far as practicable without embarrassing the steamer. Steamers are not bound to guard sailing vessels against their own misconduct. (*The New Jersey*, Olcott, 415; *The Neptune*, Id. 494; *The William Young*, Id. 41; *The New Champion*, Abbott's Admiralty, 205, 207.) When a vessel deviates from the rules of navigation, a presumption of fault arises as against her, and the burden of proof is thrown upon such vessel, to show that the collision was not occasioned by such breach of the rules. (Henry's Admiralty Jurisprudence and Procedure, 243; *The Corsica*, 9 Wall. 630; *The Roman*, 14 Fed. Rep. 61; *The Eleanora*, 17 Blatchford, 88; *The Scotia*, 14 Wall. 170; *New York & Liverpool and U. S. Mail Co.* v. *Rumball*, 21 How. 372; *Tug William Young*, Olcott, 38; *The Great Republic*, 23 Wall. 34; *The Delaware*, 1 Bissell, 110.) The Latona was the overtaking vessel, and therefore it was her imperative duty to keep out of the way of the steamer. The overtaking vessel takes upon herself the peril of determining whether a safe passage remains for her beside the vessel preceding her, and must bear the consequences of misjudgment in that respect. (Cohen's Admiralty, 220; Rule 22d, sec. 4233, Rev. Stats. U. S.; Desty's Commerce and Navigation, 44; *The Fannie Crocker*, 23 How. 448; *The Peter Ritter*, 14 Fed. Rep. 173; *The Governor*, Abbott's Admiralty, 108; *The Oceanus*, 12 Blatchford, 430; *The Charles Morgan*, 6 Fed. Rep. 913; *The Nereus*, 6 Benedict, 238; *Campbell* v. *Carter*, 14 Ill. 283; *The Nereus*, 3 Benedict, 238; *The D. M. Armstrong*, 10 Fed. Rep. 760.)

Mr. Chief Justice JONES delivered the opinion of the court.

The court below made the following findings of fact:

This cause having been heard upon the pleadings and proof, and having been argued by the advocates of the respective parties, due deliberation having been had in the premises, the court finds:

"1. That the said libellant, before and at the time of the collision mentioned in the libel, was the sole owner and proprietor of a certain steamboat called the Underwriter, of Port Townsend, in said territory, of the burden of six tons register, with her steam-engines, boilers, machinery, tackle, apparel, and furniture; which said steamboat said libellant at all of the said times used in the business of a shipping commission merchant and custom-house broker, in and about Port Townsend, and which was generally used by him for the purpose of boarding incoming vessels, in the course of his said business, in and about the harbor of said Port Townsend and the Straits of Fuca.

"2. That said libellant at all of said times was the master of said steamboat.

"3. That said steamboat was at all times, up to and at the time of the said collision, tight, stanch, strong in every respect, and well manned, tackled, appareled and appointed, and that the said master and crew of said steamboat were at all of said times on the lookout for the protection and safety of said vessel.

"4. That on the 21st day of January, 1885, while said steamboat was so employed, said libellant, then being, and at all times in the libel mentioned, up to the time of said collision, acting as master of said steamboat, sighted the British bark Latona, of St. Johns, New Brunswick, of the burden of about eight hundred tons, in ballast.

"5. That said bark when so sighted by said libellant was coming in from sea, in ballast, bound for said port of Port Townsend, and was at the entrance of Admiralty Inlet and about three-quarters of a mile north of Point Wilson.

"6. That the wind was then blowing strong from the west,

with considerable roll of the sea from the Straits of Fuca, and the bark then had her topgallant-sails, topsails, foresails, spanker, jib, and foretopmast-staysail set and had the wind free, and was running nearly dead before the wind and coming in with the tide, at the rate of about ten knots an·hour.

" 7. That said bark passed said Point Wilson, as hereinbefore mentioned, at a distance of about three-fourths of a mile, and then gradually changed her course towards Port Townsend harbor, about four points to the southward, in the meantime hauling up her foresail, which course she kept unchanged as hereinbefore stated.

" 8. That after hauling up her foresail, and up to the time of the collision hereinafter mentioned, the said bark maintained a speed of about nine knots an hour.

" 9. That said steamboat, when said bark was so sighted, was about three miles distant from her and in Port Townsend Bay, midway between Tibball's Wharf and Marrowstone Island.   That said libellant being desirous of obtaining the business of said bark, and for that purpose to get alongside of the same before she came to anchor, put said steamboat on a course for Eby's Landing, on Whidby Island, steaming at the rate of about six knots an hour, which course and speed the said steamboat maintained until said bark changed her course towards Port Townsend Harbor, as aforesaid. When said bark so changed her course said steamboat was about two and a-quarter miles from said bark, and said libellant still intending to get alongside of said bark for the purpose hereinbefore stated, put said steamboat on a course nearly parallel with that of said bark, but keeping her open about a point on the port bow of said steamboat, and still keeping said steamboat at the same rate of speed, which course and rate of speed said steamboat maintained until within about half a mile of said bark. Said libellant then blew three loud and distinct blasts of the steam whistle of said steamboat, slowed her down to a speed of about four knots an hour, and put the steamboat's helm hard-a-starboard, turned her completely around and put her on a course opposite to that in which she had been running and parallel to the course

of the bark, holding the bark open about three-quarters of a point on the starboard quarter of said steamboat, it being the intention of said libellant to allow said bark to pass by said steamboat on her starboard side, and some distance to the windward of her, so that he could speak her. This course said steamboat continued upon under a slow bell, at a rate of speed of about three knots an hour, until her helm was put hard-a-starboard, as hereinafter stated. The turning of said steamboat, and putting her on the course last aforesaid, occupied about fifteen seconds.

" 10. That said steamboat and said bark continued on their respective courses last aforesaid until said bark was within a short distance of said steamboat, and on a course which, if kept, would have enabled said bark to pass about two hundred and fifty feet on the starboard side of said steamboat; that said bark then suddenly, unexpectedly, and without any warning whatever to anyone on board of said steamboat, and without any excuse whatever for so doing, changed her course and bore directly down upon said steamboat; the moment said bark so changed her course said libellant put the helm of said steamboat hard-a-starboard, ordered the engineer to turn her engines ahead at full speed, which said order said engineer instantly obeyed; but said bark was so near, and changed her course so suddenly and unexpectedly, that said steamboat could not possibly be turned or got out of the way of said bark, and said bark struck said steamboat with the bluff of her bow with great force and violence on the starboard quarter of said steamboat, thereby turning the said steamboat so that the stem of said bark struck said steamboat with great force and violence on her starboard side, at about abreast the pilot-house door, which is forward amidships of said steamboat, thereby instantly overturning said steamboat with a shock so great and unexpected that none of those on board of said steamboat were able to escape from the same until said bark had passed completely over her as hereinafter stated.

" 11. That said bark passed completely over said steamboat, and at the time said bark was so passing over her, said

steamboat was completely submerged, and after said bark had passed over said steamboat as aforesaid, about four feet of the bow of the same appeared above the surface of the water close to the starboard quarter of said bark, and in full view of those in charge of said bark, while the persons on board of said steamboat arose to the surface in the immediate vicinity of the place where the steamboat re-appeared after being submerged, and were struggling in the water for their lives; but those in charge of said bark made no effort whatever either to save said steamboat or to rescue or render any assistance to those on board of her, but resumed the course she was steering immediately prior to the sudden change of course hereinbefore mentioned, kept on said course until she cleared Point Hudson, and then, coming up about three points, went to her anchorage in Port Townsend Bay.

"That the bow of said steamboat remained above the surface of the water about ten minutes after said collision and then sank to the bottom, in water of the depth of twenty-one fathoms at low tide, at which point she ever since has been and is now; that owing to the great depth and extreme coldness of the water in which said steamboat lies it is impossible to raise her, or remove anything of value from her, and consequently she is a total loss.

"12. That both the collision aforesaid and the loss of said steamboat were wholly caused by the negligence, inattention, and want of care on the part of the master and officers of said bark, and not by any fault, omission, or neglect on the part of the said steamboat, her master, crew, or owner, or any of them.

"13. That said bark did not, either before or at any of the times mentioned in said libel, have any watch or lookout whatever to guard against the danger of collision, and that said collision would not have occurred if said bark had kept her course, as she should have done, or had kept a proper lookout, as it was her duty to have done.

"14. That all of those on board of said steamboat did everything in their power to get out of the way of said bark, and to prevent said collision and to diminish the damages thereby.

"15. That a small steamer called the Rip Van Winkle hastened at once to the assistance of the persons thrown into the water by said collision, and proceeded with all possible dispatch to get them on board, and by the time she had succeeded in so doing, the said steamboat Underwriter sunk from sight.

"16. That said bark, at the time of said collision, and for four or five minutes prior thereto, was the following and overtaking vessel.

"17. That said bark was in fault:

"*First* In entering said harbor without a lookout.

"*Second.* In not seeing said steamboat in time to avoid a collision.

"*Third.* In changing and falling off from her course without reason therefor.

"*Fourth.* In not rounding to immediately after the collision and lowering a boat for the rescue of the crew of said steamboat.

"18. That the said steamboat Underwriter, at the time of said collision, was reasonably worth the sum of $4,000.

"19. That said libellant, in consequence of said collision, was carried down with the said steamboat, confined in the pilot-house, and finally succeeded in extricating himself and coming to the surface a short time after said steamboat's bow appeared above it.

"That in consequence of his being thrown into and kept under the water so long and his efforts to extricate himself, said libellant was greatly injured in body and health, and thereby suffered damage in the sum of $250.

"20. That said libellant, as soon as possible after said collision, procured the services of two steamers, and endeavored to get lines around said steamboat by sweeping, but was not successful in so doing, and immediately afterwards he procured the services of an experienced deep-sea diver, for the purpose of attaching proper appliances to said steamboat in order to raise her, but after thorough investigation said libellant discovered that it was impossible either to raise said steamboat or recover anything from her. That the

reasonable value of the services of said diver and the expenses necessary in the course of such investigation was $200, which sum libellant has paid therefor.

"21. On the 13th day of March, 1886, William Renton and John A. Campbell duly entered into this cause, jointly with the claimant, whereby it was stipulated and agreed for the benefit of whom it might concern, that the said stipulators were and are, and each of them was and is, bound in the sum of $6,000, conditioned that the said claimant should abide by and pay the money awarded by the final decree rendered in the cause by this court, or, in the case of appeal, by the appellate court."

The decree of that court was made September 28, 1885, against C. J. Wasson, the claimant, and his stipulators, William Renton and John A. Campbell, for the sum of $4,450 and costs.

From this decree, the appeal was taken, October 7, 1885, the notice describing the decree as of date October 1, 1885, and the title in the journal being *J. W. McAllep, Libellant,* v. *British Bark Latona, Respondent.*

The appellee moves to dismiss the appeal upon the grounds following:

1. No appeal was taken from the decree entered.
2. No appeal was perfected within the time allowed by law.
3. All the parties to the decree are not parties to the appeal.
4. None of the parties to the decree have appealed.
5. The evidence was certified after the District Court lost jurisdiction of the cause.

The mistake in the date of the decree as stated in the notice of appeal, and the title of the cause as set forth in the District Court journal, could have misled no one, and it is not pretended that there was any other decree in the cause, and the lack of technical exactness must be disregarded.

The appeal was taken under the statute of 1883, which,

by its terms, applies to all causes tried in the District Courts of the territory. (Laws of 1883, p. 59.)

By this act the notice of appeal is given in open court, or at chambers, and by order of the court or judge is entered in the journal, and thereupon the clerk must make and certify a full and complete transcript of the cause; including the journal entries, and cause it to be filed with the clerk of the Supreme Court, and thereupon the Supreme Court shall have complete and perfect jurisdiction. (Ib. sec. 1.)

Section 2 provides that this court shall hear all causes so removed upon the merits, disregarding technicalities, and even without such provision, it would be the duty of the court to so hear and try them.

The provisions in section 3, as to the manner of settling and certifying a statement of facts, are permissive and cannot affect the fact of the appeal, or the jurisdiction of this court to hear the cause in any case; and in an admiralty case, the entire proceedings and evidence being included in the transcript sent up by the clerk of the District Court, there can be very little use for a statement as provided in section 3. Where such statement is desired by the appellant, it is manifest the District Court has jurisdiction, even after the cause has been removed to the Supreme Court, to certify such statement, if it is done within the time and within the limitations of this section.

Section 5 limits the time within which an appeal may be taken to six months.

We think this appeal, in all respects except as to mere verbal criticism as stated, was perfected under this act, and brings up the whole case for trial on the merits, and the motion to dismiss is therefore overruled. A different construction is placed upon the act of 1883, in *Meeker* v. *Gardella et al.*, 2 Wash. 355. We are unable to agree with that decision, and therefore overrule it.

After careful study of the cause we adopt the findings of the district judge in their full extent.

It appears that the Latona was, at the time of the collis-

ion, and prior thereto, the overtaking vessel, running before a strong wind and with the tide, at the rate of ten knots an hour, and had the wind free. She was of eight hundred tons burden and in ballast.

The Underwriter was a small steamer of six tons register.

The Latona was making for her anchorage in Port Townsend Bay, and the steamer was in advance awaiting the approach of the bark, running at a much less rate of speed and at sufficient distance from the course of the bark to render a collision impossible had she held her course, as under the circumstances she was bound to do. The Latona had no lookout, however, and, as said by the learned judge who tried the cause below, she must have been unaware of the responsible relation she bore for several minutes before the collision.

When the steamer turned to pursue the same course as the bark, on a parallel line, she gave ample warning. She was out of the way of the bark, and had a right to be where she was at the time of the collision, and was in the pursuit of a lawful business, in open daylight, when the bark suddenly, and without cause, changed her course in such a manner as to bring her at once upon the steamer, with no possibility of escape from the collision.

The size of the bark and her rate of speed, compared with the size and speed of the steamer, insured the safety of the former and almost certain destruction of the latter, and a strong probability of the loss of life to those on board of her at the time.

There is nothing in the rule invoked here that a steamer must keep out of the way of a sailing vessel, or that the change of course by the bark was an error and not a fault, or that a steamer must give a sailing vessel ample room to pass without obstruction. The facts furnish no foundation for the application of these rules. Whether the change of course of the vessel at that time was purposely made or the result of negligence, it was equally a fault and without excuse. There is not a reasonable doubt as to the facts, and the blame must rest entirely upon the Latona. The steamer was not in fault at all.

The damages awarded by the decree appealed from are within the proof and not excessive.

Let a decree be entered in favor of the appellee for the sum of $4,450, and interest thereon from the date of the decree below, and for costs, to be taxed.

LANGFORD, J., and ALLYN, J., concurred.